Daniel P. Collins, Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF ARIZONA

| | | |
|---|---|---|
| In re | ) | Chapter 11 Proceedings |
| | ) | |
| **STAR MOUNTAIN RESOURCES, INC.,** | ) | Case No.: 2:18-bk-01594-DPC |
| | ) | |
| | ) | Adversary No.: 2:19-ap-00412-DPC |
| **Debtor.** | ) | |
| | ) | |
| **JARED PARKER, in his capacity as Plan Trustee for the Star Mountain Plan Trust,** | ) | **UNDER ADVISEMENT ORDER ON SUMMARY JUDGMENT MOTIONS CONCERNING ALTER EGO CLAIM** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | (Not for Publication – electronic Docketing ONLY)[1] |
| | ) | |
| **TITAN MINING (US) CORPORATION, a Delaware corporation; TITAN MINING CORPORATION, a British Columbia, Canada corporation; NORTHERN ZINC, LLC, a Nevada limited liability company, JOHN AND JANE DOES 1-10; BLACK CORPORATIONS 1-10; WHITE PARTNERSHIPS 1-10; and GRAY TRUSTS 1-10,** | ) | |
| | ) | |
| **Defendants.** | ) | |

Before this Court are two competing motions. The first motion is Plan Trustee, Jared Parker's ("Plaintiff" or "Plan Trustee"), Motion for Partial Summary Judgment ("Motion").[2] Plaintiff's Motion requests the Court find that Star Mountain Resources,

---

[1] This decision sets forth the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

[2] Adv. DE 130. "Adv. DE" references a docket entry in this adversary proceeding ("Adversary Proceeding"): 2:19-ap-00412-DPC.

1

Inc. ("Star Mountain or "Debtor") was insolvent under 11 U.S.C. § 548[3] and Nev. Rev. Stat. § 112.140 ("Count I") and that Northern Zinc, LLC ("Northern Zinc") was Star Mountain's alter ego ("Count II" or "Alter Ego Claim"), as set forth in the Second Amended Complaint ("Complaint").[4]

The second motion before this Court is Defendant Titan Mining (US) Corporation's ("Titan US") and Defendant Titan Mining Corporation's ("Titan BC") (collectively "Defendants") Cross Motion ("Cross Motion")[5] for Partial Summary Judgment Denying Plaintiff's Alter Ego Claim.

On May 16, 2022, the Court denied Plaintiff's Motion as it pertains to the question of insolvency, finding there were genuine issues of material fact.[6] Now, in this present under advisement order, the Court only addresses Plaintiff's Alter Ego Claim, which is foundationally important to this Adversary Proceeding.[7] The fraudulent transfer avoidance actions ("Fraudulent Transfer Claims") under §§ 544, 548, and 550 and Nev. Rev. Stat. § 112.140 are predicated on Plaintiff's contention that Northern Zinc was Debtor's alter ego, and Northern Zinc's assets were assets of the Debtor. Through his Alter Ego Claim, Plaintiff seeks to pierce the corporate veil between Debtor and Northern Zinc to expand Debtor's estate to include Northern Zinc's assets. Should this Court find that Northern Zinc is not Debtor's alter ego, that Northern Zinc's assets and liabilities were not Debtor's assets and liabilities, then the Court would necessarily dismiss Plaintiff's Complaint because the assets allegedly fraudulently transferred to Defendants were not Debtor's assets and, therefore, such transfers could not be avoided in this bankruptcy case ("Bankruptcy Case").

---

[3] Unless indicated otherwise, statutory citations refer to the U.S. Bankruptcy Code ("Code"), 11 U.S.C. 101-1532.
[4] Adv. DE 60.
[5] Adv. DE 268.
[6] Adv. DE 310.
[7] The Court's Under Advisement Order at Adv. DE 100 discusses the importance of Plaintiff's Alter Ego Claim to this Adversary Proceeding.

2

Having heard the parties' arguments at oral argument and having reviewed their briefs, this Court now holds that Plaintiff's Motion and Defendants' Cross Motion are denied. While the evidence on both sides is substantially uncontroverted, and perhaps no more evidence may come to light at trial, this Court will not weigh competing evidence at the summary judgment stage. The trier of fact must decide whether Plaintiff can sustain his burden of proof on his Alter Ego Claim.

# I.    BACKGROUND

The following facts are not in dispute.

## A.    The Pre-Bankruptcy Transactions

On November 2, 2015, Star Mountain acquired 100% of the equity interests in Northern Zinc under a purchase agreement ("NZ Purchase Agreement") between Star Mountain, Northern Zinc, and Northern Zinc's then sole member, Aviano Financial Group, LLC.[8]

Concurrent with the NZ Purchase Agreement, Northern Zinc entered into a purchase agreement ("Balmat Purchase Agreement") with Star Mountain, Hudbay Mineral Inc. ("Hudbay"), Balmat Holding Corporation ("Balmat"), and St. Lawrence Zinc Company, LLC ("SLZ") whereby Northern Zinc acquired 100% of the issued and outstanding common stock of Balmat ("Balmat Stock").[9] At the time of the Balmat Purchase Agreement, Balmat wholly owned SLZ, which owned the Balmat Mine and the accompanying mining equipment (collectively the "Balmat Assets").[10] Together, the NZ Purchase Agreement and the Balmat Purchase Agreement resulted in Star Mountain

---

[8] Adv. DE 282, ¶ 24.
[9] Adv. DE 282, ¶ 25.
[10] Adv.DE 282, ¶ 26.

3

wholly owning Northern Zinc, Northern Zinc wholly owning the Balmat Stock, and Balmat wholly owning the Balmat Assets.

On May 15, 2016, Star Mountain borrowed $500,000 from the Development Authority of North Country ("DANC Loan").[11] Northern Zinc guaranteed the DANC Loan.[12] Around the same time, Star Mountain also entered into an agreement with TCA Global Credit Master Funds, LP ("TCA"), whereby TCA purchased $3,000,000 of debentures ("TCA Debentures") from Star Mountain.[13] To secure its obligations under the TCA Debentures, Star Mountain executed a security agreement in favor of TCA ("TCA Security Agreement"). The TCA Security Agreement encumbered all of Star Mountain's ownership interests in its subsidiaries, and in all of the subsidiaries' assets, including the Balmat Assets.[14] Northern Zinc guaranteed Star Mountain's obligations under the TCA Debentures.[15]

On or around October 27, 2016, Star Mountain signed a binding letter of intent ("Augusta LOI") with Augusta Capital,[16] which initiated the sale of the Balmat Stock to Defendants.[17] On December 30, 2016, Star Mountain, Northern Zinc, Balmat, and SLZ entered into the purchase agreement ("Titan Purchase Agreement") with Defendants. The Titan Purchase Agreement called for Northern Zinc to sell the Balmat Stock to Titan US ("Titan Sale").[18] As consideration for the Balmat Stock, the Titan Purchase Agreement called for Defendants to: (1) pay $3,000,000 plus 50% of "any debts, accounts payable or liabilities owing or accrued in respect of the period up and including the Closing Date by Balmat or SLZ, or in respect of the Balmat Mine . . .;" (2) assume and satisfy the TCA Debentures for $3,318,794.30; (3) issue 2,968,900 Class A shares of Titan BC's common

---

[11] Adv. DE 131, ¶ 20.
[12] Adv. DE 271, ¶ 44.
[13] Adv. DE 131, ¶ 5.
[14] Adv. DE 131, ¶ 7.
[15] Adv. DE 282, ¶ 52.
[16] Adv. DE 282, ¶ 12.
[17] Adv. DE 271, ¶ 19.
[18] Adv. DE 271, ¶ 19.

4

stock, representing 5% of Titan BC's outstanding shares; and (4) assume the obligations incurred under the Balmat Purchase Agreement (collectively the "Consideration").[19] The Titan Purchase Agreement directed Northern Zinc to remit the Consideration to Star Mountain.[20]

## B.     The Bankruptcy

On February 21, 2018, Star Mountain filed its voluntary chapter 11 bankruptcy petition.[21] On April 18, 2018, the United States Trustee appointed the official committee of unsecured creditors ("Unsecured Creditors' Committee").[22] On May 8, 2019, the Unsecured Creditors' Committee filed its Official Committee of Unsecured Creditors' Amended Chapter 11 Plan of Liquidation ("Plan") and Amended Disclosure Statement ("Disclosure Statement").[23] The Court approved the Plan ("Confirmation Order") on July 5, 2019.[24] The Confirmation Order stated:

> [i]n accordance with VII B of the Plan, all rights and Causes of Action are fully preserved and the entry of this Confirmation Order shall not have any res judicata or other preclusive effect . . . with respect to any Causes of Action that are not specifically and expressly released by the terms of the Plan.[25]

The Plan defined "Causes of Action" broadly to mean:

> Any and all claims, actions, proceedings, causes of action…controversies…, rights to legal remedies, rights to equitable remedies, rights to payment and claims (as defined in Bankruptcy Code § 101(5)), whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, non-matured, disputed, undisputed, secured or unsecured whether identified, filed or prosecuted to date or not and whether asserted or assertable directly or derivatively, in law, equity or otherwise. Any lawsuit commenced pursuant to Bankruptcy Code §§ 544, 547, 548, 549, 550, 551 and/or 553 is included within this definition.[26]

---

[19] Adv. DE 272; Exhibit W, page 18-19. The amount and/or value of the Consideration Defendants actually remitted to Debtor is disputed.
[20] Adv. DE 272; Exhibit W, page 18-19.
[21] DE 1. "DE" references a docket entry in this Bankruptcy Case: 2:18-bk-01594-DPC.
[22] DE 42.
[23] DE 334.
[24] DE 355.
[25] DE 355, page 6.
[26] DE 334, page 6.

5

The Confirmation Order created a liquidating trust ("Liquidating Trust").[27] Plan Trustee was appointed trustee of the Liquidating Trust to "complete the liquidation process, including any and all litigation."[28] The Liquidating Trust acquired all of Debtor's assets on the Effective Date[29] of the Plan.[30]

## C. The Adversary Proceeding

On November 19, 2019, Plaintiff initiated this Adversary Proceeding by filing a complaint ("Initial Complaint").[31] Count I of the Initial Complaint asserted actual and constructive Fraudulent Transfer Claims against Defendants.[32] The purported Fraudulent Transfer Claims stem from the sale of the Balmat Stock to Defendants under the Titan Purchase Agreement.[33]

In response to the Initial Complaint, Defendants filed a Motion to Dismiss ("Initial Motion to Dismiss"). The Initial Motion to Dismiss alleged that Plaintiff lacked standing to bring the Fraudulent Transfer Claims because Debtor did not have an interest in the Balmat Stock.[34] On May 8, 2020, Plaintiff filed this amended Complaint, adding the Alter Ego Claim and naming Northern Zinc as a defendant.[35]

### 1. *Motion to Dismiss*

On May 22, 2020, Defendants filed another Motion to Dismiss ("Motion to Dismiss"), arguing that Plaintiff's Alter Ego Claim could not cure his lack of standing.[36] Defendants alleged that Plaintiff was requesting the Court to substantively consolidate

---

[27] DE 335.
[28] DE 355.
[29] DE 334, page 8. Under the Plan the Effective Date was defined as the "date on which the Bankruptcy Court enters the Confirmation Order."
[30] DE 334.
[31] Adv. DE 1.
[32] Adv. DE 60.
[33] Adv. DE 64, Exhibit A.
[34] Adv. DE 19.
[35] Adv. DE 60.
[36] Adv. DE 64.

6

the Debtor and Northern Zinc post-confirmation through the guise of his Alter Ego Claim. Defendants contended that the claim preclusive effects of the confirmed Plan barred Plaintiff from moving for substantive consolidation post-confirmation.[37]

In response, Plaintiff argued that the confirmed Plan had already provided for the consolidation of Debtor and Northern Zinc.[38] Alternatively, Plaintiff argued that Plaintiff's Alter Ego Claim would expand the bankruptcy estate to include Northern Zinc's property, permitting Plaintiff to pursue the Fraudulent Transfer Claims.[39] Plaintiff asserted that the Confirmation Order and Plan expressly reserved his right to pursue the Alter Ego Claim.[40]

The Court took the matter under advisement.[41] In the Court's order on Defendants' Motion to Dismiss ("MTD Order"), it held that neither the Plan nor Confirmation Order provided for substantive consolidation of Debtor and Northern Zinc.[42] The Court held that Plaintiff could not move for substantive consolidation post-confirmation because of the confirmed Plan's claim preclusive effect.[43] However, the Court concluded that Plaintiff's Alter Ego Claim was well-pled and "must be tried, or resolved by dispositive motion if it later appear[ed] there [were] no genuine issues of material fact."[44]

---

[37] Adv. DE 64, page 12. Defendants actually use the Latin term "res judicata." As Judge Klein noted in *In re Associated Vintage Grp.*, 283 B.R. 549, 555 (9th Cir. B.A.P. 2002), res judicata is now known as claim preclusion while collateral estoppel is now referred to as issues preclusion. *See* ("[t]he terms 'res judicata' and 'collateral estoppel' have been replaced by an updated vocabulary in the interests of precision").
[38] Adv. DE 74, page 2.
[39] Adv. DE 74, page 2.
[40] Adv. DE 92, page 7.
[41] Adv. DE 100.
[42] Adv. DE 100, page 7.
[43] Adv. DE 100, page 8.
[44] Adv. DE 100, page 10.

1

2      2. *Summary Judgment Motions*

3          (a) Plaintiff's Motion for Summary Judgment

4      On April 23, 2021, Plaintiff filed his Motion and accompanying Statement of

5  Facts ("Plaintiff's SOF").[45] Defendants filed a response ("Defendants' Response").[46]

6  Plaintiff filed a reply ("Plaintiff's Reply").[47]

7          To support his contention that Northern Zinc was nothing more than the mere alter

8  ego of Star Mountain, Plaintiff relies on the following undisputed facts: (1) Star Mountain

9  and Northern Zinc shared the same directors and officers ("D&Os") and business

10 address;[48] (2) Northern Zinc did not have separate employees, bank accounts, or financial

11 records;[49] (3) Northern Zinc relied on Star Mountain exclusively for its financial

12 strength;[50] (4) Northern Zinc did not have board meetings or keep meeting minutes;[51] (5)

13 Northern Zinc did not negotiate or enter into the Augusta LOI;[52] and (6) Star Mountain

14 received all proceeds of the Titan Sale.[53]

15          (b) Defendants' Cross Motion

16      On March 7, 2022, Defendants filed their Cross Motion and supporting Statement

17 of Facts ("Defendants' SOF").[54] Plaintiff filed a response ("Plaintiff's Response").[55]

18 Defendants' filed a reply ("Defendants' Reply").[56] First, Defendants argue that, as a

19 matter of law, Plaintiff cannot prove that recognizing the corporate separateness of Star

20 _____

21  [45] Adv. DE 130 and Adv. DE 131.
    [46] Adv. DE 270.

22  [47] Adv. DE 281.
    [48] Adv. DE 271, ¶ 31-33.

23  [49] Adv. DE 271, ¶ 38-40
    [50] Adv. DE 271, ¶ 28.

24  [51] Adv. DE 272, ¶ 35.
    [52] Adv. DE 271, ¶ 41.

25  [53] Adv. DE 271, ¶ 44.
    [54] Adv. DE 268 and Adv. DE 271.

26  [55] Adv. DE 281.
    [56] Adv. DE 300.

                                              8

Mountain and Northern Zinc would "sanction a fraud or promote injustice"—a necessary element of Plaintiff's Alter Ego Claim.[57] The crux of Defendants' argument is that Northern Zinc was created and maintained for a legitimate business purpose, namely, holding the Balmat Stock.[58] Second, Defendants argue Plaintiff's Alter Ego Claim is barred by the doctrine of claim preclusion.[59]

Defendants rely on the following undisputed evidence: (1) Northern Zinc was allegedly formed for a legitimate business purpose;[60] (2) Northern Zinc separately signed and approved all transactions relating to the Balmat Stock and the Balmat Assets;[61] (3) Northern Zinc at all times held the Balmat Stock;[62] (4) Star Mountain consistently held-out Northern Zinc as the owner of the Balmat Stock;[63] (5) Northern Zinc, as a holding company, did not require separate employees, separate bank accounts, or financial records;[64] and (6) Northern Zinc's corporate form and asset ownership structure was never altered.[65]

On May 18, 2022, the Court heard oral argument ("Oral Argument") on Plaintiff's Motion and Defendants' Cross Motion.[66] The Court then took this matter under advisement.[67]

## II. JURISDICTION

This Court has jurisdiction over this bankruptcy case and this Adversary Proceeding pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A), (H), & (O).

---

[57] Adv. DE 268, page 4.
[58] Adv. DE 268, page 7.
[59] Adv. DE 268, page 10.
[60] Adv. DE 282, ¶ 35.
[61] Adv. DE 282, ¶ 52.
[62] Adv. DE 282, ¶ 34.
[63] Adv. DE 282, ¶ 50.
[64] Adv. DE 282, ¶ ¶ 36, 37.
[65] Adv. DE 282, ¶ 61.
[66] Adv. DE 314.
[67] Adv. DE 314.

9

Case 2:19-ap-00412-DPC    Doc 320    Filed 06/22/22    Entered 06/22/22 16:14:49    Desc
Main Document    Page 9 of 40

## III. ISSUE

1. Whether Plaintiff's Alter Ego Claim is barred by claim preclusion by virtue of Debtor's confirmed Plan.

2. Whether either Plaintiff or Defendants are entitled to summary judgment on Plaintiff's Alter Ego Claim.

## IV. EVIDENTIARY OBJECTIONS

Although the parties did not focus on evidentiary issues at Oral Argument, the Court must address the evidentiary objections raised by Plaintiff and Defendants in the Motion and Cross Motion before turning to the merits of the parties' summary judgment motions.[68]

Under Bankruptcy Rule 7056, "a party may object that the material cited to support or dispute a fact cannot be presented in a *form* that would be admissible in evidence."[69] In *Fraser v. Goodale*,[70] the Ninth Circuit held that a court may consider evidence on summary judgment if that evidence *could* be presented in an admissible form at trial. At the summary judgment stage, a court may review the contents of a document and determine whether the document appears to be "sufficiently genuine."[71]

---

[68] Attachment A provides an overview of the exhibits from Defendants' SOF and Plaintiff's SOF that the Plaintiff and Defendants move to strike.

[69] Fed. R. Bankr. P. 7056 provides that Rule 56 of Fed. R. Civ. P. applies in adversary proceedings (emphasis added).

[70] *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003) (reversing the district court's decision to strike the plaintiff's diary on summary on hearsay grounds because the contents of plaintiff's diary "*could* be admitted into evidence at trial in a variety of ways") (emphasis added).

[71] *Las Vegas Sand, LLC v. Nehme*, 632 F.3d 526, 533 (9th Cir. 2011) (citing *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 778 (9th Cir. 2002)).

10

## A.      Defendants' Objections to Plaintiff's Evidence

Defendants move to strike the majority of the exhibits ("Plaintiff's Exhibits") used to support Plaintiff's Motion. The motion to strike is based on grounds of hearsay and lack of foundation and authentication. Nine of Plaintiff's Exhibits relating to the Alter Ego Claim are at issue.[72] In making their own arguments, Defendants twice rely on two of the exact same exhibits. A document authenticated by one party satisfies the requirement of authentication with regards to all parties.[73] The Court will only address Defendants' objections to the remaining seven Plaintiff's Exhibits.

Here, the Court finds that all of Plaintiffs' Exhibits may be supported by evidence in an admissible form at trial. Plaintiff's Exhibit U, V, and X ("Rothstein Emails"), which contain email communications from Star Mountain's counsel Lazarus Rothstein ("Mr. Rothstein"), could be presented in a form that would be admissible simply by calling Mr. Rothstein to testify at trial. The statements made by Plan Trustee and Star Mountain's secretary, Donna Moore, which are included in Plan Trustee's declaration ("Parker Declaration"), are also admissible for the same reasons.

The Augusta LOI, Star Mountain's Quarter End Report ("Quarterly Report"), and periodic financial reports ("Periodic Reports") are similarly admissible. The Augusta LOI and the Quarterly Report may qualify under the business record exception to the rule against hearsay. Parties to the Augusta LOI and the D&Os who prepared the Quarterly Report could testify at trial to the contents of the documents. Finally, the Court could take judicial notice of the Periodic Reports, as they are on file on Debtors' administrative case docket. After reviewing the Rothstein Emails, the Parker Declaration, the Quarterly

---

[72] *See* Attachment A for citations to the record.
[73] *See Orr v. Bank of America, NT & SA*, 285 F.3d 764,776 (9th Cir. 2002).

Report, the Periodic Report, and the Augusta LOI, the Court finds that all seven of Plaintiff's Exhibits are sufficiently genuine.

### B. Plaintiff's Objections to Defendants' Evidence

Plaintiff moves to strike the deposition testimony of Wayne Rich ("Rich") and Mark Osterberg ("Osterberg") ("Defendants' Exhibits"), which Defendants use to support their Cross Motion.[74] Plaintiff argues that Defendants' Exhibits lack foundation because Defendants did not disclose Rich and Osterberg as experts on the topic of corporate entities.

The Court finds that Defendants' Exhibits may be supported by evidence in an admissible form at trial. The deposition testimony of Rich and Osterberg asserted that Northern Zinc's operations did not require separate bank accounts or employees. That testimony is also supported by Morrie Aaron's ("Aaron") expert report ("Expert Report"). Aaron could be qualified to testify at trial. However, the Court also concludes that the opinion of an expert is not needed to support Rich's deposition testimony that Star Mountain and Northern Zinc followed proper accounting and tax procedures. At trial, Defendants could present evidence of Generally Accepted Accounting Principles ("GAAP") and the IRS guidelines, along with Star Mountain's financials, to establish that Star Mountain and Northern Zinc maintained corporate formalities in accordance with GAAP and IRS directives. Plaintiff's motion to strike the deposition testimony of Rich and Osterberg is hereby denied.

At bottom, neither Plaintiff nor Defendant have demonstrated to the Court that the contested exhibits are inadmissible in any form at trial. The Court will consider all of

---

[74] *See* Attachment A for citations to the record. Rich and Osterberg were D&Os of Star Mountain.

12

Plaintiff's Exhibits and Defendants' Exhibits in ruling on the merits of the Motion and Cross Motion.

## V.    ANALYSIS

### A.    Motion for Summary Judgment

Summary judgment is appropriate only if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." An issue is "genuine" only if there is an evidentiary basis on which a reasonable fact finder could find in favor of the non-moving party.[75]  A dispute is "material" only if it could affect the outcome of the suit under governing law.[76] "[A]t the summary judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[77]

Resolution of the parties' competing summary judgment motions would require the Court to weigh conflicting evidence and choose between the parties' competing reasonable inferences of the uncontroverted evidence. The Court will not and cannot perform such tasks at the summary judgment stage.

### B.    The Claim Preclusive Effect of the Confirmed Plan

The Court must first address Defendants' argument that Plaintiff is barred from raising his Alter Ego Claim based on the doctrine of claim preclusion. Defendants argue Plaintiff's Alter Ego Claim arises from the same information and facts as a claim for

---

[75] *In re Marciano*, 459 B.R. 27, 51 (9th Cir. B.A.P. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).
[76] *Id.* at 52.
[77] *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 249).

13

substantive consolidation, which the Court previously held was barred by the confirmed Plan's claim preclusive effect.[78]

### 1. *Substantive Consolidation vs. Alter Ego*

While the factors underlying a claim for substantive consolidation and a claim for alter ego often overlap, substantive consolidation is distinguishable from state law alter ego claims.[79] Substantive consolidation "enabl[es] a bankruptcy court to disregard separate corporate entities, to pierce their corporate veils in the usual metaphor, in order to reach assets for the satisfaction of debts of a related corporation."[80] An alter ego finding under state law may weigh heavily in support of substantive consolidation, yet there are significant differences between the two causes of action.[81]

First, "the power of substantive consolidation derives from the bankruptcy court's general equitable powers as expressed in § 105."[82] Substantive consolidation is purely a federal bankruptcy cause of action, whereas an alter ego claim is a question of state law.[83] Second, substantive consolidation is a more extensive form of relief than the typical alter ego claim. "Orders of substantive consolidation combine the assets and liabilities of separate and distinct—but related—legal entities into a single pool and treat them as

---

[78] Adv. DE 100.
[79] *See In re Bonham*, 226 B.R. 56, 76 (D. Alaska 1988) *aff'd by* 229 F.3d 750 (9th Cir. 2000); *In re Wheeler*, 444 B.R. 598, 609 (Bankr. D. Idaho 2011) (finding that "[w]hile substantive consolidation includes a veil-piercing element it is more than that").
[80] *Bonham*, 229 F.3d at 764 (quoting *In re Continental Vending Mach. Corp.*, 517 F.2d 997, 100 (2d Cir. 1975)).
[81] *See In re Owens Corning*, 419 F.3d 195, 206 (3d. Cir. 2005) (finding substantive consolidation goes "in a different direction (and in most cases further)" than piercing the corporate veil); *see also In re American Camshaft Specialties, Inc.*, 410 B.R. 765, 785 (Bankr. E.D. Mich. 2009) (finding "a cause of action for substantive consolidation is not the same as a cause of action to pierce the corporate veil"); *In re Cooper*, 147 B.R. 678, 683 (Bankr. D. N.J. 1992) (noting "there are material differences between the doctrines" of substantive consolidation and alter ego).
[82] *Bonham*, 229 F.3d at 764.
[83] *Owens Corning*, 419 F.3d at 206.

14

though they belong to a single entity."[84] As a result, "the claims of creditors against separate debtors morph to claims against the consolidated survivor."[85] Alter ego, in contrast, typically functions as "a limited merger for the benefit of a particular creditor."[86]

As a result, the analysis for substantive consolidation is more involved than the analysis for an alter ego finding. While claims for substantive consolidation and alter ego may share facts in common, such as unity of interest and ownership, commingling funds, and the failure to observe corporate formalities, courts ordering substantive consolidation also consider: (1) the presence or absence of consolidated financial statements; (2) the existence of parent and intercorporate guarantees on loans; and (3) the degree of difficulty in segregating or ascertaining the assets and liabilities of the different entities.[87] In *In re Bonham*, the Ninth Circuit established that a party requesting substantive consolidation must show that creditors dealt with two entities as a "single economic unit and did not rely on their separate identify in extending credit," or "the affairs of the debtor are so entangled that consolidation will benefit all creditors."[88]

Substantive consolidation is better thought of as an economic remedy, the primary goal being the equitable treatment of all creditors.[89] Conversely, a state law alter ego claim is an equitable remedy focused on preventing "fraud or injustice."[90]

---

[84] *Bonham*, 229 F.3d at 764.
[85] *Owens Corning*, 419 F.3d at 205.
[86] *In re Creditors Serv. Corp.*, 195 B.R. 680, 689 (Bankr. S.D. Ohio 1996). An alter ego claim has a different effect in the bankruptcy context than in the traditional civil trial setting, where a specific creditor brings a judgment against the alleged alter ego. An alter ego finding in bankruptcy is more similar to substantive consolidation, bringing the assets of the alter ego into the debtor's estate to be shared collectively with the debtor's creditors. Here, recovery by Plaintiff will benefit all creditors holding claims against Debtor.
[87] *Cooper*, 147 B.R. at 684.
[88] *Bonham*, 299 F.3d at 766.
[89] *See id.* at 766 (adopting the Second Circuit's test for substantive consolidation, which is grounded in "economic theory"); *see also Cooper*, 147 B.R. at 682 (finding the court must weigh "the economic prejudice of continued debtor separateness versus the economic prejudice of substantive consolidation").
[90] *Cooper*, 147 B.R. at 683.

15

The Court recognizes that Nevada's alter ego doctrine "does not merely shift liability." Plaintiff's Alter Ego Claim, if successful, will produce a result similar to substantive consolidation. Northern Zinc's assets would become Debtor's assets, which are now the assets of the Plan Trust.[91] This, however, does not bar Plaintiff from pursuing his Alter Ego Claim. Failure to move for substantive consolidation prior to plan confirmation "does not . . . supplant analogous state law remedies that allow courts to pierce the corporate veil."[92] Claim preclusion does not bar Plaintiff from bringing his Alter Ego Claim post-confirmation.

2. *Application of Claim Preclusion to Confirmation Proceedings*

In *In re Associated Vintage Group, Inc.* ("*Associated Vintage*"), the Ninth Circuit Bankruptcy Appellate Panel ("BAP") held that the elements of "[c]laim preclusion must be properly tailored to the unique circumstances that arise when the previous litigation took place in the context of a bankruptcy case."[93] Unlike a discrete civil lawsuit, a chapter 11 bankruptcy case may involve numerous players and any number of contested matters, claims, and/or adversary proceedings.[94] A party raising the affirmative defense of claim preclusion must prove that the earlier suit: (1) involved the same claim or cause of action as the later suit, (2) reached a final judgment on the merits, and (3) involved identical parties or their privies.[95]

---

[91] Adv DE. 100, page 11.
[92] *In re American International Refinery*, 402 B.R 728, 742 (Bankr. W.D. La. 2008).
[93] *In re Associated Vintage Grp. Inc.*, 283 B.R. 549, 558-59 (9th Cir. B.A.P. 2002).
[94] *See In re Goldstein*, 297 B.R. 766, 771 (Bankr. D. Ariz. 2003) (finding collateral estoppel is "more easily applied to an adversary proceeding than to the administrative bankruptcy case").
[95] *V.V.V. & Sons Edible Oils Limited v. Meenakshi Overseas, LLC*, 946 F.3d 542, 546 (9th Cir. 2019).

Here, there is no dispute that the confirmed Plan in Debtor's Bankruptcy Case is a final judgment on the merits for the purposes of claim preclusion.[96] The main question the Court must address is whether Plaintiff's Alter Ego Claim involves the same parties and the "same cause of action" as raised in Debtor's confirmed Plan.

### (a) The Parties

"[A] party for the purposes of a former adjudication includes one who participates in a [c]hapter 11 plan confirmation proceeding."[97] The Ninth Circuit BAP cautioned that identifying parties in a chapter 11 proceeding may "necessitate tailoring," given the collective nature of a chapter 11 bankruptcy case.[98] A review of the BAP's decisions in *In re Wolfberg* ("*Wolfberg*"), *In re Kelley* ("*Kelley*"), and *In re Heritage Hotel P'Ship* ("*Heritage Hotel*") highlights when the later suit "involves the same parties" as the prior confirmation proceeding.

In *Wolfberg*, the debtors' confirmed plan provided that the proceeds from selling their residence would be used to pay unsecured creditors.[99] The debtors' disclosure statement listed their home as a nonexempt asset.[100] Post-confirmation, the trustee objected to the debtors attempt to amend their schedules to claim a homestead exemption in their residence.[101] The *Wolfberg* court held that "the post-confirmation chapter trustee . . . [was] a party to the plan confirmation as a representative of creditors who were parties to the plan confirmation proceedings."[102] Because the post-confirmation trustee and the

---

[96] *In re Heritage Hotel P'Ship I*, 160 B.R. 374, 377 (9th Cir. B.A.P. 1994), *aff'd by* 59 F.3d 175 (9th Cir. 1995) (holding "[i]t is now well-settled that a bankruptcy court's confirmation order is a binding, final order, according full *res judicata* effect and precludes the raising of issues which could or should have been raised during the pendency of the case . . .").

[97] *In re Ampace Corp.*, 279 B.R. 145, 155 (Bankr. D. Del. 2002).

[98] *Associated Vintage Grp.*, 283 B.R. at 559 (finding that because a chapter 11 proceeding involves many parties the role of the players as plaintiff and defendant can become cloudy).

[99] *Id.* at 561 (citing *In re Wolfberg*, 255 B.R.879, 881 (9th Cir. B.A.P. 2000).

[100] *Id.*

[101] *Id.*

[102] *Id.* at 559 (citing *Wolfberg*, 225 B.R. at 992).

17

debtor were both parties to the confirmed plan, the court concluded that the debtor was barred from subsequently amending his homestead exemption post-confirmation. [103]

*Kelley* and *Heritage Hotel* involved two-party disputes between the debtor and the same creditor in the confirmation proceeding and the subsequent action.[104] In *Kelley*, the debtors negotiated and resolved the creditor's objection to their plan by agreeing to a specific interest rate for the creditor's claim in exchange for the creditor relinquishing other security.[105] The debtors treated the creditor's claim as valid throughout the plan confirmation proceedings.[106] Post-confirmation, the debtors sued the creditor on state law grounds, objecting to the validity of the creditor's claim.[107] The *Kelley* court held that the debtors' subsequent suit was barred because it related to the same transaction resolved by the debtors and the creditor during the plan confirmation process.[108]

In *Heritage Hotel*, the debtor's confirmed chapter 11 plan provided for the specific treatment of a secured creditor's claim.[109] The confirmed plan authorized the secured creditor to foreclose by a certain date if the debtor had not tendered payment.[110] Post-confirmation, and four days before the foreclosure date, the debtor brought a lender liability suit against the secured creditor.[111] The lender liability suit involved the same claim that was resolved by the confirmed plan.[112] The *Heritage Hotel* court concluded that the confirmed plan barred the debtor's lender liability suit post-confirmation.[113]

Unlike *Wolfberg*, *Heritage*, and *Kelley*, neither the Disclosure Statement in Debtor's chapter 11 nor the confirmed Plan resolved any dispute with Defendants.[114] While Defendants had notice of the Plan and the right to object, Defendants never had an

---

[103] *Id.*
[104] *Kelley*, 199 B.R. 698, 700-01 (9th Cir. B.A.P. 1996); *Heritage Hotel*, 160 B.R. at 375-76.
[105] *Associated Vintage Grp.*, 283 B.R. at 561 (citing *Kelley*, 199 B.R. at 703).
[106] *Id.*
[107] *Id.*
[108] *Id.*
[109] *Associated Vintage Grp.*, 283 B.R. at 561 (citing *Heritage Hotel*, 160 B.R. at 375-76).
[110] *Id.*
[111] *Id.*
[112] *Id.*
[113] *Id.*
[114] DE 335 and DE 355.

18

allowed creditor claim and did not vote on the Plan.[115]  Here the confirmed Plan did not target the Defendants or Debtor's claims against the Defendants. The Plan and this Adversary Proceeding are not focused on the "same parties." Rather, the Plan reserved the right to sue on claims. Some of those claims turned out to be claims against the Defendants.

### (b) Same Cause of Action

"Claim preclusion does not bar *all* unasserted claims that theoretically could have been raised, but only those based on the same cause of action *that was actually asserted previously*."[116]  In determining whether an asserted claim involves the same cause of action as the previous suit, the Ninth Circuit looks at whether the two claims arise from the "same transactional nucleus of facts."[117]  In the bankruptcy context, the "transactional nucleus" analysis "necessarily turns on the terms, the context, and timing of the particular chapter 11 plan."[118]  In *Associated Vintage*, the BAP relied on its decisions in *Wolfberg*, *Kelley*, and *Heritage Hotel* to define when there is "a logical nexus between the subject of the second action and what was resolved in the plan so they fit the same 'transactional nucleus of facts.'"[119]

After reviewing *Wolfberg*, *Kelley*, and *Heritage Hotel*, the Ninth Circuit BAP in *Associated Vintage* held that the plan disbursing agent's preference claim, which sought to avoid a secured creditor's security interest post-confirmation, was not barred by the confirmed plan.[120]  The plan disbursing agent's claim "had little to do with the plan confirmation proceedings."[121]  The debtor's confirmed plan did not provide for any specific or "specially-negotiated treatment" of the secured creditor's claim but generally adopted the bankruptcy liquidation scheme.[122]

---

[115] Adv. DE 92, page 5.
[116] *Eastern Minerals & Chemical Co. v. Mahan*, 225 F.3d 330, 336 (3d Cir. 2000) (emphasis added).
[117] *Associated Vintage Grp.*, 283 B.R. at 558.
[118] *Id.* at 560.
[119] *Id.* at 561.
[120] *Id.* at 561-62.
[121] *Id.* at 561.
[122] *Id.* at 562.

19

Here, as noted in the Court's MTD Order, the Plan and the Disclosure Statement never expressly mentioned substantive consolidation.[123] A request for substantive consolidation was never asserted or granted, nor did the Plan or Disclosure Statement provide for any type of "specifically-negotiated" treatment with respect to Defendants. This is not a situation where Plaintiff is trying to bring the Alter Ego Claim after failing to meet the more stringent requirements of substantive consolidation during the confirmation proceeding.[124] Plaintiff's Alter Ego Claim does not share the "same transactional nucleus of facts" with *any* claim that was actually raised, litigated, or resolved during the confirmation process.[125]

Moreover, claim preclusion "only precludes the assertion of [claims] that '*could* or should have been raised during the pendency of the case . . .'"[126] The confirmation process constitutes a contested matter under the Bankruptcy Rules. While the appropriate time to raise substantive consolidation is during the plan confirmation process, Debtor's Bankruptcy Case was not the appropriate forum to raise or resolve Plaintiff's Alter Ego Claim.[127] A state law alter ego claim must be commenced as an adversary proceeding under Fed. R. Bankr. P. 7001.[128] Unlike an adversary proceeding, the 7000 series of Bankruptcy Rules do not generally apply to contested matters. There is no mandatory joinder of claims requirement. A party is not required to raise and resolve every claim or issue that may arise in the future at the plan confirmation stage.[129] To require otherwise would undermine the plan confirmation process which aims to efficiently reorganize a debtor and allow for flexibility.[130]

---

[123] Adv. DE 100, page 9.
[124] *See Wheeler*, 444 B.R. at 609-10 (holding a bankruptcy trustee cannot use alter ego or piercing the corporate veil claims to escape the rigorous requirements of substantive consolidation).
[125] *See Eastern Minerals & Chemical Co.*, 225 F.3d at 339 (noting that in applying claim preclusion "care must be taken in determining whether the first bite [of the apple] was actually taken such that it would preclude the second").
[126] *Kelley*, 199 B.R. at 703(citing *Heritage Hotel*, 160 B.R. at 377) (emphasis added).
[127] *See* § 1123(a)(5)(c) ("a plan shall –(5)provide adequate means for the plan's implementation, such as –(C) merger or consolidation of the debtor with one or more persons").
[128] *In re USN Communications, Inc.* 280 B.R. 573, 587 (Bankr. D. Del. 2002).
[129] *See Associated Vintage Grp.*, 283 B.R. at 564.
[130] *See id.*

20

### 3. *Exceptions to the Application of Claim Preclusion*

Under § 1123(b)(3), a plan may provide that a "particular cause of action, or categories of action, are preserved and not affected by confirmation."[131] In *Associated Vintage*, the Ninth Circuit held that a "general reservation of rights" may be legally sufficient.[132] There is no specificity requirement under § 1123(b)(3).[133] It is "impractical and unnecessary to expect that a disclosure statement and plan must list each and every possible defendant and each and every possible obligations under the plan."[134]

The Plan reserved all "Causes of Action that were not specifically and expressly released by the terms of the Plan" for Plan Trustee to pursue.[135] While the Plan broadly defined "Causes of Action" to mean "any and all claims . . . ," including "any lawsuit commenced pursuant to Bankruptcy Code §§ 544, 547, 548, 549, 550, 551 and/or 553," this Court finds such reservation is legally sufficient.[136] There is no evidence that Plaintiff contemplated bringing the Alter Ego Claim at the time of Plan confirmation or should have expressly reserved the right to do so. Plaintiff did not raise his Alter Ego Claim until almost a year after the Court confirmed Debtor's Plan, and not until Defendants challenged Plaintiff's standing to bring the Fraudulent Transfer Claims.[137]

Having resolved issue one in Plaintiff's favor, the Court will address the second issue—whether Plaintiff or Defendants are entitled to summary judgment on Plaintiff's Alter Ego Claim.

### C. Nevada's Alter Ego Doctrine

Under Nevada law, "reverse piercing is appropriate in those limited instances where the particular facts and equities show the existence of an alter ego relationship and

---

[131] *Id.* at 563 (citing *Kelley*, 199 B.R. at 703-04).
[132] *Id.* at 563-64.
[133] *Id.* at 564.
[134] *Id.*
[135] DE 355.
[136] DE 334.
[137] Adv. DE 60.

require that the corporate fiction be ignored so that justice may be promoted."[138]
"Reverse-veil piercing" applies when a court "pierces the corporate veil to hold a wholly-owned subsidiary liable for its parent company's debts."[139] It is well established under Nevada law that the principle of reverse veil piercing extends to a plan trustee in bankruptcy.[140]

In *In re American International Refinery*, the court held that the bankruptcy plan trustee had standing to pursue a fraudulent transfer avoidance action on behalf of a debtor's non-debtor subsidiary if the subsidiary was the alter ego of the debtor. The court reasoned that Nevada's alter ego doctrine "does not merely shift liability from one entity to another, but expands the debtor's estate to include the property of its alter ego."[141] Thus, a debtor in bankruptcy "has, in some sense, an equitable interest in the assets of its alter ego."[142] Recently, in *Magliarditi v. TransFirst Grp., Inc.*, the Nevada Supreme Court confirmed that the alter ego of a debtor "is a 'debtor' under Nevada's Uniform Fraudulent Transfer Act (NUFTA)."[143]

To prove the existence of an alter ego relationship, Plan Trustee must show by preponderance of the evidence that:

> (1) the corporation is influenced and governed by the [entity] asserted to be the alter ego; (2) there is such unity of interest and ownership that one is inseparable from the other; and (3) the facts must be such that adherence to the corporate fiction of separate entities would, under the circumstances, sanction a fraud or promote injustice.[144]

---

[138] *LFC Mktg. Grp., Inc. v. Loomis*, 8 P.3d 841, 846 (Nev. 2000).
[139] *American International Refinery*, 402 B.R. at 744.
[140] *See In re National Audit Defense Network*, 367 B.R. 207, 230 (Bankr. D. Nev. 2007) (finding "the Trustee established a unity of interest between the various defendants . . . through the demonstration of 100% ownership of the [corporate] defendants and their joint purpose . . . it would promote injustice and fraud to not hold the [corporate] defendants] liable for the debts of their owners").
[141] *American International Refinery*, 402 B.R. at 744.
[142] *Id.* at 745.
[143] *Magliarditi v. TransFirst Grp., Inc.*, 2019 WL 5390470, *6 (Nev. Oct. 21, 2019).
[144] *LFC Mktg. Grp., Inc.*, 8 P.3d at 846-47; *see also* Nev. Rev. Stat. §§ 78.747 and 86.376.

22

Nevada courts have not defined the temporal limits for assessing whether an alter ego relationship exists. A general review of alter ego cases suggests that the pertinent time to analyze the alleged alter ego relationship is at the time the transaction occurred and/or the liability arose.[145] In certain circumstances, it may be appropriate for a court to consider the relationship of the entities prior to the time of the transaction.[146]

For the purposes of resolving the competing motions for summary judgment, this Court will take into consideration all evidence supplied to the Court as it relates to Star Mountain's and Northern Zinc's relationship from the time Star Mountain acquired Northern Zinc to the time of the Titan Sale.[147]

### 1. *Influenced and Governed*

The first element of Nevada's alter ego statute requires that Plaintiff show Northern Zinc was "influenced and governed" by Star Mountain. In *Lipshie v. Tracy Inv. Co.*, the Nevada Supreme Court held that the mere fact a parent company owns all of the stock of its subsidiary corporation and shares identical officers, without more, is insufficient to show the parent "influenced and governed" the subsidiary corporation.[148] Rather, the plaintiff must show that the subsidiary corporation "is so organized and

---

[145] *See Groden v. N&D Transportation Co., Inc.*, 866 F.3d 22, 30 (1st Cir. 2017) (noting plaintiff sought to amend its complaint to specify "N&D was D&N's alter ego at the times pertinent" to the disputed liability); *see also In re Wolf*, 595 B.R. 735, 758-59 (Bankr. N.D. Ill. 2018) (finding trustee's legal ability to recover the alleged fraudulent transfers depended on his ability to treat the corporation as the alter ego of the debtor at the time the transfers took place); *American International Refinery*, 402 B.R. at 743 (assessing the alter ego relationship at the time of the pre-petition transfer).
[146] *See Morgan Stanley High Yield Securities, Inc. v. Jecklin*, 2018 WL 2014065, *20 (D. Nev. Apr. 30, 2018) (considering the evidence in its totality including facts regarding the relationship between the two entities before and after the transaction giving rise to the alter ego claim).
[147] While there is no defined temporal limit under Nevada law, the Court finds that the evidence relating to Northern Zinc as a corporate entity before Star Mountain's acquisition of Northern Zinc is helpful by way of background, but not as to whether Northern Zinc is Star Mountain's alter ego.
[148] *Lipshie v. Tracy Inv. Co.*, 566 P.2d 819, 823 (Nev. 1977).

23

controlled, and its affairs are so conducted that it is, in fact, a mere instrumentality or adjunct of [the parent corporation]."[149]

The facts material to the "influence and governance" element of Plaintiff's Alter Ego Claim are largely not in dispute. Rather, the dispute revolves around how the Court should interpret Plaintiff's and Defendants' competing evidence.

Plaintiff argues that Star Mountain directed all Northern Zinc's actions and made all decisions relating to the Balmat Assets.[150] Star Mountain wholly owned Northern Zinc and both entities shared the same D&Os.[151] The summary judgment record reveals that Star Mountain, not Northern Zinc, entered into the Augusta LOI, which called for the transfer of Northern Zinc's sole asset, the Balmat Stock.[152] Northern Zinc never approved any transactions that were not negotiated by Star Mountain.[153] Northern Zinc was also never represented by counsel during negotiations regarding the TCA Debentures or the Titan Sale, whereas Star Mountain was represented by Legal & Compliance, LLC during both transactions.[154]

Defendants argue Plaintiff's undisputed evidence does not support the conclusion that Star Mountain "influenced and governed" Northern Zinc, given Northern Zinc's business structure as a holding company.[155] Defendants primarily rely on Aaron's conclusion that the relationship between Star Mountain and Northern Zinc was proper and common as a relationship between a parent company and its wholly owned subsidiary holding company.[156] Defendants' evidence supports that, on behalf of Northern Zinc, the D&Os separately entered into and consented to all agreements involving the Balmat

---

[149] *Bonanza Hotel Gift Shop, Inc. v. Bonanza No. 2*, 596 P.2d 227, 229 (Nev. 1979).
[150] Adv. DE 130, page 13.
[151] Adv. DE 271, ¶¶ 1, 32.
[152] Adv. DE 271, ¶ 41.
[153] Adv. DE 271, ¶ 26.
[154] Adv. DE 271, ¶¶ 37,43.
[155] Adv. DE 270, page 7.
[156] Adv. DE 282, ¶¶ 27-44.

Assets and Balmat Stock, including the Balmat Purchase Agreement, the DANC Loan, the TCA Debentures, and the Titan Purchase Agreement.[157] While Northern Zinc was not a named party to the Augusta LOI, the Titan Purchase Agreement separately recognized Northern Zinc as the owner and "seller" of the Balmat Stock.[158] The D&Os also separately executed resolutions and consents on behalf of Northern Zinc in connection with the Titan Sale.[159]

If the Court were to grant Plaintiff's Motion or Defendants' Cross Motion, the Court would necessarily have to weigh the evidence. While some of the evidence shows Northern Zinc acted as a separate entity, Northern Zinc was directed by the same D&Os that controlled Star Mountain. Similarly, the Court would have to assess and weigh Aaron's credibility and conclusion that Star Mountain exercised a level of "influence and control" typical of a parent company and its wholly owned subsidiary holding company. The Court will not weigh the evidence, even undisputed evidence, at the summary judgment stage. This alone precludes the Court from granting Plaintiff's Motion.

    2. *Unity of Interest*

Next, Nevada's alter ego statute requires this Court to find that Northern Zinc and Star Mountain are inseparable by virtue of their "unity of interest." In determining whether such "unity of interest" exists between a parent corporation and its wholly owned subsidiary, Nevada courts have looked to the following factors: (1) commingling of funds; (2) undercapitalization; (3) unauthorized diversion of funds; (4) treatment of corporate assets as an individual's own; and (5) failure to observe corporate

---

[157] Adv. DE 282, ¶ 45, 52.
[158] Adv. DE 282, ¶ 58.
[159] Adv. DE 282, ¶ 64.

25

Case 2:19-ap-00412-DPC    Doc 320    Filed 06/22/22    Entered 06/22/22 16:14:49    Desc
Main Document    Page 25 of 40

formalities.[160] None of these factors alone will conclusively establish that an alter ego relationship exists.[161]

Plaintiff argues Star Mountain and Northern Zinc did not maintain corporate formalities. Plaintiff's evidence shows that Star Mountain and Northern Zinc shared the same business address and the same D&Os.[162] Northern Zinc did not have separate employees, bank accounts, or liabilities.[163] Northern Zinc did not file separate tax returns or maintain separate financial records.[164] Plan Trustee testified that he found no evidence suggesting Northern Zinc conducted regular corporate meetings or maintained meeting minutes.[165] Star Mountain paid the Balmat Asset's operating and carrying costs.[166]

Next, the Rothstein Emails support Plaintiff's contention that Northern Zinc was undercapitalized. On March 14, 2018, Mr. Rothstein stated in an email that Northern Zinc had "no assets and [was] totally financially dependent on [Star Mountain] for funding."[167] The Periodic Reports filed in the Bankruptcy Case also support that Northern Zinc had no cash flow, operations, or anticipated operations, nor would Northern Zinc have had incoming cash flow.[168] At no point after Star Mountain acquired Northern Zinc was the Balmat Mine ever actually operated.[169]

Finally, Plaintiff argues Star Mountain treated the Balmat Stock as its own by negotiating the terms of the Titan Purchase Agreement.[170] Star Mountain also sought and

---

[160] *Polaris Indus. Corp. v. Kaplan*, 747 P.2d 884, 887 (Nev. 1987).
[161] *Id.*
[162] Adv. DE 271, ¶¶ 33,32.
[163] Adv. DE 271, ¶¶ 36, 38, 39, 40.
[164] Adv. DE 271, ¶¶ 38.
[165] Adv. DE 271, ¶ 35.
[166] Adv. DE 271, ¶ 28.
[167] Adv. DE 271, ¶ 28.
[168] Adv. DE 271, ¶ 46.
[169] Adv. DE 314.
[170] Adv. DE  271, ¶ 42.

26

approved the Titan Sale to pay its obligations.[171] Most significantly, Star Mountain, not Northern Zinc, received the proceeds of the Titan Sale.[172]

Conversely, Defendants' Expert Report suggests Northern Zinc did maintain proper corporate formalities, given its only business purpose was to hold the Balmat Stock.[173] Aaron opined that Northern Zinc did not require separate capitalization, bank accounts, or employees.[174] Rich and Osterberg testified during their deposition that Star Mountain followed proper accounting procedures by including Northern Zinc—its wholly owned subsidiary—in its financials on a consolidated basis.[175] Rich's deposition testimony also supports Defendants' contention that Star Mountain properly followed IRS guidelines by including Northern Zinc in its tax returns.[176]

At Oral Argument, Defendants argued that remitting the proceeds from the Titan Sale to Star Mountain did not support an alter ego finding.[177] The summary judgment record supports Defendants' contention that Northern Zinc was liable under the Balmat Purchase Agreement, the DANC Loan, and the TCA Debentures ("Outstanding Obligations").[178] Defendants contend Northern Zinc benefited from the Titan Sale because the consideration received from Defendants relieved Northern Zinc of its Outstanding Obligations. Defendants argue that, since Northern Zinc had no other purpose besides holding the Balmat Stock, and had no other assets or liabilities, Northern Zinc remitted the proceeds from the Titan Sale to Star Mountain.

Finally, Defendants contend that Star Mountain did not treat the Balmat Assets as its own. Defendants' evidence supports the notion that Star Mountain consistently

---

[171] Adv. DE 271, ¶ 45.
[172] Adv. DE 271, ¶¶ 36.
[173] Adv. DE 272, Exhibit K.
[174] Adv. DE 282, ¶¶ 36-38.
[175] Adv. DE 282, ¶ 39.
[176] Adv. DE 282, ¶ 40.
[177] Adv. DE 314.
[178] Adv. DE 282, ¶ 52.

27

disclosed in its public filings and marketing materials that Northern Zinc owned the Balmat Stock. There is also no evidence that Star Mountain and Northern Zinc commingled assets.[179] Northern Zinc held 100% ownership of the Balmat Stock at all relevant times.[180]

Given the competing, albeit uncontested evidence, the Court will not now weigh the evidence. At trial, the trier of fact must weigh Plaintiff's and Defendants' competing evidence.

### 3. *Fraud or Injustice*

For the Court to find Northern Zinc is the alter ego of Star Mountain, Nevada's statute requires a finding that recognizing Northern Zinc as a separate entity would work a "fraud or injustice." Defendants argue that to establish the "fraud or injustice" element, Plaintiff must prove that: (1) "the corporate structure of Northern Zinc was abused, that its corporate structure was designed to prevent its creditors from being paid," and (2) "aggrieved creditors reasonably relied on the corporate structure to their detriment" (*i.e.*, creditor reliance).[181] Defendants contend that the only "fraud or injustice" Plaintiff asserts is the alleged fraudulent transfer itself, which cannot alone support an alter ego finding by this Court.[182]

---

[179] Adv. DE 282, ¶ 53.
[180] Adv. DE 282, ¶ 34.
[181] Adv. DE 268, page 6.
[182] Adv. DE 268, page 9.

(a) Actual Fraud is not Required

In the seminal case *Frank McCleary Cattle Co. v. Sewell* ("*McCleary*"), the Nevada Supreme Court held that to prove the "fraud or injustice" element of an alter ego claim, "[i]t is not necessary that the plaintiff prove actual fraud."[183] "It is enough if the recognition of the two entities as separate *would result in an injustice*."[184] Since the *McCleary* decision, the Nevada Supreme Court has not expounded upon the exact contours of when a court should find an alter ego relationship exists to prevent "fraud or injustice." Rather, Nevada courts have stressed that "there is no litmus test for determining when the corporate fiction should be disregarded; the result depends on the circumstances of each case."[185]

In *Mallard Automotive Grp. Ltd. v. LeClair Mgmt. Corp.*, the Nevada District Court held that the plaintiff did not have to establish that the alleged alter ego corporation was "set up to be a sham" to prove that recognizing the corporation's separate existence would result in a "fraud or injustice."[186] Rather, the plaintiff only needed to prove that "adherence to the corporate form would perpetuate a fraud *or injustice*."[187]

In *ASARCO LLC v. Americas Mining Corp.* ("*ASARCO*"), a case relied on by Defendants, the court found that the debtor's wholly owned subsidiary (the alleged alter ego) "was created for a legitimate reason and not to effect a fraud, injustice or unfairness."[188] However, this did not foreclose the court from finding that "the corporate form was later misused or manipulated to accomplish the alleged fraudulent transfer."[189]

---

[183] *Frank McCleary Cattle Co. v. Sewell*, 317 P.2d 957, 959 (Nev. 1957) (citing *Gordon v. Aztec Brewing Company*, 203 P.2d 522, 527 (Cal. 1949)), *overruled by Callie v. Bowling*, 160 P.3d 848 (Nev. 2007).
[184] *Id* (internal quotes omitted) (emphasis added).
[185] *Polaris Indus. Corp.*, 747 P.2d at 887.
[186] *Mallard Auto. Grp., Ltd. v. LeClair Mgmt. Corp.*, 153 F.Supp.2d 1211, 1216 (D. Nev. 2001).
[187] *Id* (emphasis added).
[188] *ASARCO LLC v. Americas Mining Corp.* 396 B.R. 278, 321-22 (S.D. Tex. 2008).
[189] *Id.*

Here, Defendants' undisputed evidence shows that Northern Zinc was initially established as a legitimate holding company, serving a proper business purpose, namely, holding the Balmat Stock.[190] There is no evidence that Star Mountain acquired Northern Zinc with the intent to effectuate a fraud. There was no alteration of the corporate form or asset ownership structure of Star Mountain or Northern Zinc.[191]

The summary judgment record before the Court does not support a finding of actual fraud. However, Nevada law does not require that there be some form of active manipulation, abuse, or evil intent to justify an alter ego finding by this Court. The fact Northern Zinc served a proper, legitimate business function, does not necessarily negate a finding that recognition of Northern Zinc and Star Mountain as separate corporate entities "*would result in an injustice*."[192]

### (b) Creditor Reliance is not Required

Nevada law does not require Plaintiff to show Star Mountain's creditors reasonably relied on Star Mountain and Northern Zinc as one-and-the same to prove the "fraud or injustice" element of his Alter Ego Claim. In *In re Giampietro,* the Nevada Bankruptcy Court held that "whether [plaintiff] has shown that it meets the third requirement . . . –that is, whether recognition of [the] [entity's] separate existence would sanction a fraud or promote injustice—resolves itself into an examination of [plaintiff's] reasonable expectations at the time the parties signed the [a]greement."[193] The *Giampietro* court found that the creditor could not prove the "fraud or injustice element"

---

[190] Adv. DE 282, ¶ ¶ 27 -30, 35.
[191] Adv. DE 282, ¶ ¶ 59-61.
[192] *McCleary*, 317 P.2d at 959 (emphasis added).
[193] *In re Giampietro*, 317 B.R. 841, 856-57 (Bankr. D. Nev. 2004).

30

of its alter ego claim because at the time of the transaction the creditor recognized and dealt with the entity and its alleged alter ego as two separate entities.[194]

In reaching this conclusion, the *Giampietro* Court relied on Judge George's synthesis of Nevada alter ego cases through 1980 in *In re Twin Lakes Village, Inc.* ("*Twin Lakes*").[195] In *Twin Lakes*, Judge George determined that in finding an "injustice," "Nevada courts have focused on the 'element of reliance,' or more particularly on 'reasonable reliance' by the complaining creditor upon debtor conduct which would indicate either the absence of a corporate form or the assumption of liability by a person or entity controlling an openly visible corporation."[196]

In *Soule v. High Rock Holding, LLC* ("*Soule*"), the Nevada District Court subsequently criticized the *Giampietro* court's imposition of "creditor reliance" as a necessary element to a finding of alter ego. In *Soule*, the plaintiff gave a loan to the owner of two businesses to support the owner's business ventures.[197] When the owner's two businesses filed bankruptcy, plaintiff filed a summary judgment motion, seeking to hold the two businesses jointly and severally liable on the owner's outstanding loan balance under an alter ego liability theory.[198] The bankruptcy court denied the Plaintiff's motion, finding that "there was no reliance, nor was there any reasonable expectation by the [plaintiff] that anyone other than the [owner] would repay him."[199]

On appeal, the Nevada District Court held that "a showing of reliance or reasonable expectation . . . is not a necessary element for application of the alter ego doctrine in Nevada."[200] Rather, "the Supreme Court of Nevada . . . has shown its

---

[194] *Id.* at 857.
[195] *Id.* at 853.
[196] *Id* (citing *In re Twin Lakes Village, Inc.*, 2 B.R. 532, 542 (Bankr. D. Nev. 1980).
[197] *Soule v. High Rock Holding, LLC*, 514 B.R. 626, 628 (D. Nev. 2014).
[198] *Id.* at 629.
[199] *Id.*
[200] *Id.*

willingness to apply the doctrine to a broad range of factual scenarios . . ."[201] The *Soule* court did not find one Nevada state court opinion supporting the *Giampietro* court's conclusion.[202] In *Twin Lakes*, creditor reliance was only one of the many factors Judge George considered when analyzing the "fraud or injustice" element, including whether there was evidence of intent to avoid payment of the relevant debt obligation and/or evidence of fraud or illegality.[203] The Nevada District Court concluded that "federal courts must respect the stated purpose of the alter ego doctrine, which is to 'do justice' whenever it appears the protections provided by the corporate form are being abused."[204]

A review of the Nevada Supreme Court's alter ego precedent does not support Defendants contention that Plaintiff must establish creditor reliance to justify piercing the corporate veil.[205] As noted by the *Soule* court, requiring such a showing would impermissibly narrow the alter ego doctrine.[206] For example, a creditor's alter ego claim would fail simply because a parent company and its subsidiary were so sophisticated in their dealings that it was not obvious to a creditor at the time of the transaction that the two corporations functioned as one.[207] In this Court's view, the Nevada District Court's decision in *Soule* more closely aligns with the goal of Nevada's alter ego doctrine "to do justice."[208] Plaintiff's Alter Ego Claim will not die on the summary judgment vine simply

---

[201] *Id.* at 636.
[202] *Id.* at 633.
[203] *Soule*, 514 B.R. at 633.
[204] *Id.* at 636.
[205] *See LFC Mktg. Grp., Inc*, 8 P.3d at 905 (focusing on how the owner structured his business activities to avoid payment of the debt obligation and never mentioning or alluding to the creditor's reliance or reasonable expectations); *see also Polaris Indus. Corp.*, 747 P.2d at 88 (finding plaintiff proved the "fraud or injustice" element of its alter ego without every mentioning whether the creditor relied on the belief that the alleged alter ego would be liable on the note); *McCleary*, 317 P.2d at 958-59 (finding plaintiff proved the "fraud or injustice" element of its alter ego claim without mentioning reliance or reasonable reliance).
[206] *Soule*, 514 B.R. at 635-36.
[207] *See id*.
[208] *LFC Mktg. Grp., Inc.*, 8 P.3d at 847 (finding "the 'circumstances of every case' and the interests of justice should control") (Nev. 2000); *Polaris*, 747 P.2d at 888 (holding "[t]he essence of the alter ego doctrine is to do justice").

because Plaintiff cannot explicitly allege Star Mountain's creditors reasonably relied on the absence of the corporate form between Star Mountain and Northern Zinc.[209]

### (c) The Titan Sale Alone Cannot Justify an Alter Ego Finding

Defendants primarily rely on the Southern District Court of Texas' decision in *ASARCO* to support their argument that Plaintiff's Fraudulent Transfer Claims, standing alone, "cannot be the 'fraud or injustice' that justifies veil piercing."[210] A close review of *ASARCO* supports this Court's view that Plaintiff's Alter Ego Claim must be resolved by the trier of fact.

In *ASARCO*, the debtor and debtor's wholly owned subsidiary brought a fraudulent transfer avoidance action against debtor's parent corporation, alleging the parent corporation fraudulently transferred the stock held by the wholly owned subsidiary to itself.[211] The wholly owned subsidiary, while in bankruptcy, did not have any creditors but only existed to hold the transferred stock.[212] As a result, the debtor sought to establish that its wholly owned subsidiary was its alter ego under Delaware law so that it could claim an interest in the transferred stock.[213]

The defendant parent company in *ASARCO* argued that the "fraud or injustice" supporting debtor's claim "must be distinct from the allegations of the underlying cause of action."[214] In response, the *ASARCO* court clarified that "[m]ost of the cases in which

---

[209] Even assuming creditor reliance was a necessary requirement to show "fraud or injustice," the summary judgment record is not devoid of evidence which could support a finding that the creditors of Star Mountain reasonable relied on the absence of the corporate form between Star Mountain and Northern Zinc. The undisputed evidence shows that: Star Mountain, not Northern Zinc, entered into the Augusta LOI, initiating the Titan Sale; Star Mountain received the consideration from the Titan Sale; and Northern Zinc and Star Mountain were always co-obligors on transactions relating to the Balmat Assets and the Balmat Stock.
[210] Adv. DE 268, page 9.
[211] *ASARCO*, 396 B.R. at 278.
[212] *Id.* at 322.
[213] *Id.* at 316-17.
[214] *Id.* at 320.

33

a court states that the requisite unfairness or injustice cannot be the underlying cause of action are cases in which the underlying claim is for breach of contract or some other allegation that is wholly unrelated to the manipulation of the corporate form."[215] The court held that if the "[debtor] prove[d] that the corporate from was manipulated or misused so as to accomplish a fraudulent transfer, it may be equitable to pierce the veil."[216]

The *ASARCO* court concluded that the debtor and the wholly owned subsidiary functioned as a single economic unit, and the only reason the defendant would escape liability "would be because . . . the legal owner of the stock at the time of the transaction, did not have any creditors with standing to avoid the transfer."[217] As a result, the debtor's creditors would be deprived of the debtor's "most valuable asset and its best means of paying its outstanding debts," while the defendant would be shielded from liability for the transfer it orchestrated.[218]

Applying the same logic, the Court finds Plaintiff is not merely relying on his Fraudulent Transfer Claims as the "injustice" to support his Alter Ego Claim. Assuming Plaintiff's Alter Ego Claim and Fraudulent Transfer Claims are proven, the only way Star Mountain's creditors could recover the Balmat Stock would be through Plaintiff's Alter Ego Claim. Star Mountain acquired Northern Zinc, and therefore the Balmat Assets but Star Mountain allegedly never had the capital to get the Balmat Mine operating. Instead, Star Mountain, allegedly, turned around and sold the Balmat Stock for less than reasonably equivalent value, shielding Defendants from potential liability. As discussed by Plaintiff's counsel at Oral Argument, Star Mountain could have just as easily

---

[215] *Id.*
[216] *Id.* at 321.
[217] *ASARCO*, 396 B.R. at 321.
[218] *Id.*

34

structured the Titan Sale as a direct sell of its interest in Northern Zinc to Defendants.[219] Star Mountain's creditors now bear the brunt of any lost market value of the Balmat Assets.

The Court does not attempt to put its finger on the scale, but rather, simply highlights how Plaintiff's evidence if successfully weighed at trial against Defendants' evidence could establish more than merely alleging that the "injustice" lies in the Titan Sale alone. Whether the facts justify a finding of alter ego between Star Mountain and Northern Zinc is a question for the trier of fact to weigh. This Court is, however, mindful that Nevada law is clear that "[t]he corporate cloak is not lightly thrown aside."[220]

## VI.    CONCLUSION

For the foregoing reasons, Plaintiff's Motion and Defendants' Cross Motion are hereby denied. To hold otherwise, would require the Court to weigh the evidence and draw inferences from the facts presented. Regardless of whether the evidence presented by both sides is undisputed, on summary judgment motions, the Court cannot perform tasks reserved for the trier of fact. The Court also finds that the record on summary judgment is not devoid of evidence from which Plaintiff could establish that recognizing Star Mountain and Northern Zinc as separate entities would "promote a fraud or injustice." Whether the weight of evidence will support a finding that fraud or injustice would be promoted if Northern Zinc and Star Mountain are found to be legally separate entities is not a question this Court will answer on the parties' competing motions for summary judgment.

---

[219] Adv. DE 314.
[220] *LFC Mktg. Grp., Inc.,* 8 P.2d at 903 (citing *Baer v. Amos. J. Walker, Inc.,* 452 P.2d 916, 916 (1969)).

35

**ORDERED**

**DATED AND SIGNED ABOVE.**

**To be Noticed through the BNC to:**
Interested Parties

36

1

2

3

4

5

6

7

8

9

10                                  **ATTACHMENT A**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# EVIDENTIARY OBJECTIONS

## I. Summary of Exhibits relating to Alter Ego Facts[1]

| Summary of Plaintiff's Exhibits (DE 131) |
|---|
| *Exhibit E*: Securities Purchase Agreement between Star Mountain and TCA |
| *Exhibit H*: Star Mountain's Quarter End Report 9/30/16 |
| *Exhibit K*: Augusta LOI |
| *Exhibit P*: Titan Sale Purchase Agreement |
| *Exhibit Q*: Unanimous Written Consent ("UWC") Approving Titan Sale |
| *Exhibit U*: Email from Rothstein |
| *Exhibit V*: Email from Rothstein |
| *Exhibit W*: Jared Parker's Declaration |
| *Exhibit X*: Email from Rothstein |
| *Exhibit Y*: Official Form 426 Periodic Reports |

| Summary of Defendants' Exhibits (DE 272) |
|---|
| *Exhibit H*: Mark Osterberg's Deposition |
| *Exhibit I*: Wayne Rich's Deposition |
| *Exhibit K*: MCA Expert Report |
| *Exhibit L*: Northern Zinc's ("NZ") UWC electing D&Os |
| *Exhibit M*: NZ's UWC 3/10/16 |
| *Exhibit N*: Officer Certificate re TCA Debenture Agreement |
| *Exhibit O*: NZ's UWC  3/23/16 |
| *Exhibit P*: NZ's UWC in Lieu of Special Meeting 12/30/16 |
| *Exhibit Q*: NZ's UWC 10/12/15 |
| *Exhibit R*: Star Mountain's 10-Q SEC Report for 6/30/16 |
| *Exhibit S*: Star Mountain's 10-Q SEC Report for 3/31/16 |
| *Exhibit T*: Securities Purchase Agreement between Star Mountain and TCA |
| *Exhibit U*: TCA Debentures |
| *Exhibit W*: Titan Purchase Agreement |
| *Exhibit X*: Star Mountain's UWC in Lieu of Special Meeting 11/2/16 |
| *Exhibit Y*: NZ's UWC in Lieu of Special Meeting 12/30/16 |
| *Exhibit Z*: NZ's UWC in Lieu of Special Meeting 12/30/16 |

**Total Exhibits at Issue: 9**

---

[1] * Overlapping Exhibits

## II. Defendants' Objections to Plaintiff's Evidence

1. Fact: Debtor paid for the operating & carrying costs of the Balmat Assets.[2] ==*Exhibit U*==
   a. *Objection*: Inadmissible hearsay, lacks foundation & authentication.
2. Fact: NZ had no separate capitalization.[3] ==*Exhibit U*==
   a. Objection: Same.
3. Fact: Debtor did not appoint D&Os for NZ until at least 4 months after Debtor acquired NZ.[4] ==*Exhibit V*==
   a. Objection: Same.
4. Fact: Debtor directed NZ to appoint same D&Os.[5] ==*Exhibit V & Exhibit H*==
   a. Objection: Same.
5. Fact: No records that NZ conducted regular meetings or kept meeting minutes.[6] ==*Exhibit W*==
   a. Objection: Hearsay & authentication
6. Fact: Only transactions approved by NZ are ones Debtor negotiated.[7] ==*Exhibit W*==
   a. Objection: Same.
7. Fact: NZ was not represented by separate counsel in TCA transaction.[8] ==*Exhibit E*==
   a. Objection: Inadmissible hearsay, lacks foundation & authentication
8. Fact: NZ did not maintain separate financial records or tax returns and had no liabilities.[9] ==*Exhibit W*==
   a. Objection: Hearsay & authentication
9. Fact: NZ had no employees.[10] ==*Exhibit W*==
   a. Objection: Same.
10. Fact: NZ had no separate bank account.[11] ==*Exhibit W*==
    a. Objection: Same.
11. Fact: Debtor entered into the LOI with Augusta Capital.[12] ==*Exhibit K*==
    a. Objection: Inadmissible hearsay, lacks foundation & authentication
12. Fact: Debtor's D&Os negotiated Titan Sale.[13] ==*Exhibit Q*==
    a. Objection: Same.
13. Fact: NZ was never represented by separate counsel during the Titan Sale.[14] ==*Exhibit X*==
    a. Objection: Same.
14. Fact: Debtor sold Balmat Stock to pay Debtor's debts.[15] ==*Exhibit Q*==
    a. Objection: Same.

---

[2] Adv. DE 271, ¶ 28.
[3] Adv. DE 271, ¶ 29.
[4] Adv. DE 271, ¶ 30.
[5] Adv. DE 271, ¶ 31.
[6] Adv. DE 271, ¶ 35.
[7] Adv. DE 271, ¶ 36.
[8] Adv. DE 271, ¶ 37.
[9] Adv. DE 271, ¶ 38.
[10] Adv. DE 271, ¶ 39.
[11] Adv. DE 271, ¶ 40.
[12] Adv. DE 271, ¶ 41.
[13] Adv. DE 271, ¶ 42.
[14] Adv. DE 271, ¶ 43.
[15] Adv. DE 271, ¶ 45.

15. Fact: Periodic Reports showed that NZ had "no financials" and no cash flow, etc.[16] **Exhibit Y**
    a. Objection: Inadmissible hearsay and lacks foundation.
16. Fact: Debtor's counsel during Star Mountain's bankruptcy argued that the automatic stay should apply to NZ.[17] **Exhibit U**
    a. Objection: Same.

**Number of Exhibits Objected to: 9**
**Exhibits that Overlaps with Defendants' Evidence: 2** (Exhibit E & Exhibit Q)
**Total Exhibits for the Court to Rule On: 7**

**III. Plaintiff's Objections to Defendants' Evidence**

1. Fact: NZ as a holding company did not require employees.[18] **Exhibit I & Exhibit K**
    a. Objection: Rich is not a disclosed expert/lacks foundation. The evidence would not be admissible at trial because Defendants' have not disclosed Rich as an expert.
2. Fact: NZ as holding company did not require separate bank accounts.[19] **Exhibit I, Exhibit H, & Exhibit K**
    a. Objection: Same as above.
3. Fact: Debtor included NZ on its balance sheet in accordance with proper accounting procedures.[20] **Exhibit I**
    a. Objection: Same as above.
4. Fact: Debtor included NZ on its tax returns according to applicable IRS standards.[21] **Exhibit I**
    a. Objection: Same as above.

**Number of Exhibits Objected to: 2** (Exhibit I & Exhibit H)

---

[16] Adv. DE 271, ¶ 46.
[17] Adv. DE 271, ¶ 48.
[18] Adv. DE 282, ¶ 36.
[19] Adv. DE 282, ¶ 37.
[20] Adv. DE 282, ¶ 39.
[21] Adv. DE 282, ¶ 40.